AMY R. ATWOOD (OSB #060407)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
(971) 717-6401
atwood@biologicaldiversity.org

*Lead Attorney for Plaintiffs*


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION


| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; CASCADIA WILDLANDS; PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS; INSTITUTE FOR FISHERIES RESOURCES; NATIVE FISH SOCIETY, | Case No: 6:18-cv-1035 |
|         Plaintiffs, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
|   v. | |
| PETER DAUGHERTY, in his official capacity as Oregon State Forester; KATHERINE SKINNER, in her official capacity as District Forester for the Tillamook District; MICHAEL CAFFERATA, in his official capacity as District Forester for the Forest Grove District; DANIEL GOODY, in his official capacity as District Forester for the Astoria District, | |
|         Defendants. | |

INTRODUCTION

1.      In this citizen suit brought under the Endangered Species Act ("ESA" or "Act"),

16 U.S.C. § 1540(g), conservation and fishing organizations seek relief for the unlawful take of

threatened coho salmon from logging, log-hauling, and road construction and maintenance

authorized by Defendants in the Tillamook and Clatsop state forests of northwestern Oregon.

Plaintiffs seek declaratory and injunctive relief against Defendants Peter Daugherty—the State

Forester of the Oregon Department of Forestry ("ODF")—and the district foresters for the

Tillamook, Forest Grove, and Astoria ODF districts, in their official capacities, to remedy

Defendants' authorizations of logging operations on state forestlands that cause the unlawful

"take" of Oregon coast coho salmon, a protected species under the ESA, in violation of Sections

4(d) and 9 of the Act, *see* 16 U.S.C. §§ 1533(d), 1538(a)(1)(B) & (G).

2.      Defendants have planned and sold, and unless enjoined, will continue to plan and

sell timber from state forestlands in the Tillamook and Clatsop state forests that cause landslides

and debris flows, deliver harmful sediment pollution to coho-bearing streams, and limit the

supply of large woody debris, which is a necessary component of coho habitat.  In addition, the

State Forester and district foresters have authorized, and unless enjoined will continue to

authorize construction, maintenance, and use of roads for the hauling of cut logs that cause

landslides and result in chronic sediment inputs to streams that take coho salmon without lawful

authorization to do so.

3.      While they have taken initial steps in the past to secure an "Incidental Take

Permit" pursuant to ESA section 10(a)(1)(B), *see* 16 U.S.C. § 1539(a)(1)(B), Defendants have

never completed a final "Habitat Conservation Plan" ("HCP") or obtained an Incidental Take

Permit from the National Marine Fisheries Service ("NMFS") that would allow them to incidentally take coho salmon in compliance with the ESA, and have no definite plan to do so.

4.      Therefore, Plaintiffs—five conservation and fishing organizations—respectfully request declaratory relief and an injunction to prevent the State Forester and the district foresters from continuing to plan and authorize logging and road-building and maintenance practices on the Tillamook and Clatsop state forests that cause unauthorized take of coho salmon until Defendants have prepared a final HCP and obtained a valid Incidental Take Permit.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to the ESA citizen suit provision, *see* 16 U.S.C. §1540(g), which seeks to enjoin Defendants from further violations of the ESA and its implementing regulations.

6.      As required by 16 U.S.C. § 1540(g)(2)(A)(i), Plaintiffs have provided Defendants with formal notice of the violations embodied in this complaint.  The Center for Biological Diversity submitted a notice of intent to sue by letter dated February 13, 2014, that was directed to State Forester Peter Daugherty's predecessor, Doug Decker, and the district foresters for the Tillamook, Forest Grove, and Astoria districts.  All Plaintiffs except for the Native Fish Society supplemented the Center's first notice of intent to sue by letter dated April 5, 2017, which was received by all Defendants on or before April 14, 2017.  By letter dated April 3, 2018, Plaintiffs again supplemented their previous notices of intent to add the Native Fish Society as a co-plaintiff.

7.      Venue in this district is proper under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(b)(2).

PARTIES

8.      Plaintiff the CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit organization that is dedicated to the preservation, protection, and restoration of biological diversity, native species, and ecosystems.  The Center is incorporated in California and headquartered in Tucson, Arizona with offices in Alaska, Arizona, California, Colorado, the District of Columbia, Florida, Hawai'i, Idaho, Minnesota, Nevada, New Mexico, New York, North Carolina, Oregon, Washington, and Mexico.  The Center has long advocated for coho salmon protection.  For example, the Center brought litigation to ensure a plan to recover the Oregon Coast population of coho salmon.  The Center also has worked to protect streams occupied by coho salmon from development in California.  The Center's Oregon office and Endangered Species Program have also advocated for protections for old-growth and state forest lands in Oregon by attending and testifying at Board of Forestry and State Land Board meetings, advocating for stronger protections for imperiled wildlife on state and private forestlands, and participating in litigation to provide greater protections for imperiled species on state forests. The Center has more than 63,000 members, including over 1,600 in Oregon, many who enjoy exploring Oregon's forests and observing, studying, fishing for and photographing coho salmon. The Center has members who regularly enjoy, view, study, and/or fish coho salmon on the Clatsop and Tillamook state forests who are injured by logging and road construction authorized by Defendants on high-risk, erosion-prone, or hydrologically connected areas, causing sediment to be delivered to coho-bearing streams and take of Oregon Coast coho salmon.

9.      Plaintiff CASCADIA WILDLANDS is a non-profit organization based in Eugene, Oregon.  Representing approximately 10,000 members and supporters, Cascadia Wildlands is devoted to the conservation of the Cascadia Bioregion, which extends from northern California

to southeastern Alaska. Cascadia Wildlands uses a combination of education, organizing, outreach, litigation, advocacy, and collaboration to defend wild places and promote sustainable, restoration-based forestry. Cascadia Wildlands has long advocated for improved management of forests, the protection of older forests, and for the recovery of imperiled species dependent on older forests such as the coho salmon. For over a decade, Cascadia Wildlands has focused on the Tillamook and Clatsop state forests and its imperiled species, including Oregon Coast coho salmon. Cascadia Wildlands has members who regularly enjoy, view, study, and/or fish coho salmon on the Clatsop and Tillamook state forests who are injured by logging and road construction authorized by Defendants on high-risk, erosion-prone, or hydrologically connected areas, causing sediment to be delivered to coho-bearing streams and take of Oregon Coast coho salmon.

10.     Plaintiff PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS ("PCFFA") is a 501(c)(6) non-profit corporation organized as a commercial fishing industry trade association. PCFFA has two regional offices, including its Northwest Regional Office in Eugene, Oregon. PCFFA is the largest trade association of commercial fishing families on the West Coast, organized as a federation representing fifteen separate member organizations, with individual members who engage in commercial fishing as a livelihood. PCFFA's member organizations and affiliates span the West Coast, from San Diego to Alaska. PCFFA is active in Congress, implements Coast Guard safety regulations, protects river flows, promotes high quality seafood through sustainable fisheries, stops water pollution discharges, works to protect salmon spawning and rearing habitat in coastal watersheds, and opposes dam operations that would block salmon access to their native habitat. Many of PCFFA's member organizations' individual members also depend upon at-sea harvest of salmon

for their livelihoods.  However, because these salmon are "anadromous," they require healthy

freshwater habitat to spawn successfully.  Ocean salmon fisheries are governed by the doctrine

of "weak stock management," which sets harvest limits for all salmon fisheries based on the

status of the weakest stocks.  As a very weak stock, Oregon coastal coho salmon are consistently

a limiting factor in harvest of all other intermingling salmon fisheries up and down the West

Coast.  To protect its members' access to West Coast salmon fisheries, PCFFA devotes

substantial organizational resources to conservation of Oregon Coast coho salmon, including

from logging and roads on the Tillamook and Clatsop state forests.  This lawsuit is part of

PCFFA's efforts to restore and sustain coho salmon throughout the range of the species.

11.    Plaintiff INSTITUTE FOR FISHERIES RESOURCES ("IFR") is a 501(c)(3)

non-profit corporation that is headquartered in San Francisco, California with and offices and

staff in San Francisco and Eugene, Oregon.  Established in 1993 by the PCFFA, with which it

remains closely affiliated, the IFR carries out fishery research and serves the resource

conservation needs of working fishing men and women, and works to achieve sustainable

fisheries.  To this end, the IFR works on salmon habitat protection and restoration issues in

Oregon and elsewhere, with a focus on reducing the impacts of dams, water diversions, and

forestry, as well as working on salmon habitat conservation projects and advocacy throughout

the Pacific Northwest and beyond.

12.    Plaintiff NATIVE FISH SOCIETY is a 501(c)(3) non-profit corporation.  The

Native Fish Society is the leading science-based native fish conservation organization in the

Pacific Northwest, with over 3,700 members and supporters and 87 River Stewards.  Guided by

the best available science, Native Fish Society advocates for the recovery and protection of wild,

native fish, including Oregon Coast coho salmon, and promotes the stewardship of the habitats

that sustain them.  Native Fish Society has members who regularly enjoy, view, study, and/or fish coho salmon on the Clatsop and Tillamook state forests who are injured by logging and road construction authorized by Defendants on high-risk, erosion-prone, or hydrologically connected areas, causing sediment to be delivered to coho-bearing streams and take of Oregon Coast coho salmon..

13.    Defendant PETER DAUGHERTY is the State Forester of Oregon.  Under the Oregon Forest Practices Act and Oregon forest practice regulations, the State Forester reviews and approves written plans for management of the Tillamook and Clatsop state forests and logging and road construction and maintenance on all Oregon state forest lands.  Defendant Daugherty is sued in his official capacity.

14.    Defendant KATHERINE SKINNER is the District Forester for the Tillamook District, which includes a large portion of the Tillamook State Forest.  Under the Oregon Forest Practices Act, Oregon forest practices regulations, and written plans for management of state forestlands, including the Tillamook State Forest, District Forester Skinner authorizes logging and road building and maintenance operations on the Tillamook State Forest.  Ms. Skinner is sued in her official capacity.

15.    Defendant MICHAEL CAFFERATA is the District Forester for the Forest Grove District, which includes a portion of the Tillamook State Forest.  Under the Oregon Forest Practices Act, Oregon forest practice regulations, and written plans for management of state forest lands, including Tillamook State Forest, defendant District Forester Cafferata authorizes logging and road building and maintenance operations on the Tillamook State Forest.  Mr. Cafferata is sued in his official capacity.

16.    Defendant DANIEL GOODY is the District Forester for the Astoria District, which includes the Clatsop State Forest.  Under the Oregon Forest Practices Act, Oregon forest practice regulations, and written plans for management of state forest lands including the Clatsop State Forest, defendant District Forester Goody authorizes logging and road building and maintenance operations on the Clatsop State Forest.  Mr. Goody is sued in his official capacity.

LEGAL BACKGROUND

I.    THE ENDANGERED SPECIES ACT PROHIBITS ANY PERSON FROM CAUSING INCIDENTAL TAKE OF OREGON COAST COHO SALMON WITHOUT AN INCIDENTAL TAKE PERMIT.

17.    Congress enacted the ESA in 1973 to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, … a program for the conservation of such endangered and threatened species, and to take such steps as may be appropriate to achieve [these] purposes . . . ."  16 U.S.C. § 1531(b).  "Conservation" or "to conserve" means "to use and the use of all methods and procedures which are necessary to bring any [listed] species to the point at which the measures provided pursuant to this Act are no longer necessary."  *Id*. § 1532(3).

18.    To achieve its conservation purpose, the ESA provides a framework for listing and substantively protecting species that are at risk of extinction, and recovering them to the point where the Act's substantive protections are no longer necessary.

A.    The Listing Process

19.    The ESA vests administration of the Act in the Secretary of the Interior for terrestrial and freshwater species, and in the Secretary of Commerce for marine species, including salmonids.  The Secretaries have delegated their authorities under the Act to the U.S. Fish and Wildlife Service and NMFS, respectively (collectively "the Services") (generically "the

Service"). 50 C.F.R. § 402.01(b). Accordingly, NMFS administers the Act for Oregon Coast coho salmon.

20.    NMFS determines whether "species" under its jurisdiction are "endangered" or "threatened." An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range … ." *Id*. § 1532(6). A species is "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

21.    A "species" is defined by the ESA to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1531(16).

22.    Congress did not define the term "distinct population segment" ("DPS") in the Act. NMFS has issued a policy for application of the authority to list DPSs of Pacific salmon stocks. *See* Policy on Applying the Definition of Species Under the Endangered Species Act to Pacific Salmon, 56 Fed. Reg. 58,612 (Nov. 20, 1991). Under this policy, NMFS will consider a population of Pacific salmon, also called a "stock" or a "run," to be a DPS—and hence a "species" that is eligible to be listed as threatened or endangered under the ESA—if the population is an "evolutionarily significant unit" ("ESU") of the species. *Id*. A population is an ESU if it (1) is "substantially reproductively isolated from other nonspecific population units;" and (2) "represent[s] an important component in the evolutionary legacy of the species." *Id*. at 58,618.

23.    When making listing determinations, NMFS applies the "best scientific and commercial data available" to five statutory factors, including (1) "the present or threatened destruction . . . of [the species'] habitat;" (2) the "overutilization of the species" by humans; (3)

disease or predation; (4) "the inadequacy of existing regulatory mechanisms;" and (5) "other natural or manmade factors affecting" the species' existence.  16 U.S.C. § 1533(a).  Any one or more of these factors support a determination to list a species as endangered or threatened under the ESA.  50 C.F.R. § 424.11(c).

24.     ESA section 4(d) allows NMFS, whenever it "deems [it] necessary and advisable to provide for the conservation" of a threatened species, to issue a special regulation that extends the take prohibition found in ESA section 9(a)(1)(A)(2) to a species that is listed as threatened.  16 U.S.C. § 1533(d).  This is known as a "special rule" or a "4(d) rule."  Special rules apply only to threatened species because section 9 protections automatically extend to endangered species under the statute.  *Id*. § 1538(a)(2).

B.     The ESA's Substantive Legal Protections Including the Take Prohibition

25.     Once a species is listed as threatened or endangered, the ESA imposes substantive protections that work to reverse the extinction threat and recover the species to the point when the Act's protections are no longer necessary.

26.     For example, ESA section 7(a)(1) imposes a duty on all federal agencies to "utilize their authorities in furtherance of the purposes of this Act."  *Id*. § 1536(a)(1).  ESA section 7(a)(2) places an affirmative obligation on federal agencies to avoid actions that could jeopardize the continued existence of endangered or threatened species or could adversely modify a listed species' critical habitat.  *Id*. § 1536(a)(2).  Federal agencies meet their duty under ESA section 7(a)(2) by fully satisfying the procedural obligations that are found in the Services' implementing regulations.  *See* 50 C.F.R. Part 402.

27.     The ESA also requires the Services to develop a "recovery plan" for each listed species.  16 U.S.C. § 1533(f).  A recovery plan is a science-based assessment of a species' status with site-specific management actions, providing a map for a listed species' road to recovery.

28.     The ESA also prohibits any "person"—including "any officer, employee, agent, department, or instrumentality . . . of any State, municipality, or political division of a State," or "any State, municipality, or political subdivision of a State," *id*. § 1532(13)—from causing the "take" of any species that is listed as "endangered."  *Id*. § 1538(a)(1)(B).  To "take" a species means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect" any individual of the species, or "attempt to engage in any such conduct."  *Id*. § 1532(19).

29.     Additionally, the ESA prohibits any "person" from "violat[ing] any regulation pertaining to" any threatened species.  *Id*. § 1538(a)(1)(G); *supra* at ¶ 23.

30.     To avoid liability and potential prosecution by the Service or parties invoking the ESA's citizen-suit provision, 16 U.S.C. § 1540(a), (b), (g), a person can obtain a permit from NMFS to carry out otherwise lawful activities that result in take of coho salmon, such as logging and road construction.  16 U.S.C. § 1539(a)(1)(B).  This is known as an "Incidental Take Permit" ("ITP").

31.     To obtain an ITP, a person must prepare and submit to NMFS a Habitat Conservation Plan ("HCP") for approval.  An HCP must specify: (1) how an activity will result in incidental take of a listed species; (2) measures that will minimize and mitigate such take; and (3) why less-harmful alternatives are not being utilized.  *Id*. § 1539(a)(2)(A).  If NMFS determines that an applicant's HCP meets these requirements and that issuance of an ITP likely will not jeopardize the species' continued existence, the agency will issue an ITP with the "terms and conditions as the [Service] deems necessary or appropriate …."  *Id*. § 1540(a)(2)(B).

FACTUAL BACKGROUND

II.    OREGON COAST COHO SALMON

32.    Coho salmon are anadromous fish in the salmon family that occur in ocean waters, rivers, and streams around the northern Pacific Rim.  Also called "silver salmon," these salmon grow to about 28 inches in length and weigh 7 to 11 pounds.

33.    Coho salmon use small streams with stable beds of gravel for spawning, which occurs primarily in November and December.  Coho salmon eggs—which are deposited in nests called "redds"—hatch during the late winter or early spring, remaining as larvae for six or seven weeks until they have fins and can feed in the water column.

34.    For the next one (or, less often, two years), young coho remain in natal streams, utilizing side channels, pools created by large woody debris, beaver ponds, and other areas with slow moving water and good cover from predators.  They then become smolts and migrate to the ocean from March through July, where they remain for a year and a half in most cases, feeding on invertebrates and small fishes, and then migrating back to their natal streams to spawn and die.

35.    Because coho salmon spend up to half of their lives in freshwater, the condition of these habitats determines whether they will survive and successfully reproduce.

36.    It is estimated that in the early 1900s, one to two million coho salmon returned from the sea to Oregon coastal rivers and streams.  By the 1960s, that number declined more than 90 percent, to just 45,000 to 150,000 fish.

37.    By the 1990s, the population complex of coho returning to rivers along the Oregon Coast dropped to less than about 30,000 adults, an estimate that was below five percent of estimates from the early 1900s.  By 1997, the Oregon Coast population was down to just

26,200 fish.  A 1998 assessment of the coho population in the Tillamook Bay basin found a significant probability of extirpation due to poor-quality freshwater habitat.  Since 1994, harvest limits for fisheries for wild coho salmon have been sharply curtailed or even closed.  Under the "weak stock management" doctrine, very low Oregon Coast coho populations trigger closures and restrictions of all other ocean salmon fisheries where Oregon Coast coho intermingle with other more abundant stocks.  *See supra* at ¶ 10.

38.    In 1998, NMFS listed the population of coho salmon along Oregon Coast—*i.e.*, the "Oregon Coast coho salmon evolutionary significant unit"—as a "threatened" species under the ESA.  *See* 50 C.F.R. § 227.4(o).  The Oregon Coast coho salmon "ESU" ranges from the Necanicum River near Seaside, Oregon, to the Sixes River near Port Orford, Oregon, and includes all freshwater habitats (rivers, streams, and lakes).

39.    Mostly due to favorable ocean conditions from 2011 to 2014, Oregon Coast coho abundance rebounded to more than 350,000 spawners, but then declined to 57,000 in 2015 and stayed below 76,000 through 2017.

40.    Following several court challenges and status reviews, NMFS reissued its listing of the ESU in 2005, 2008, and 2011.  *See* 70 Fed. Reg. 37,160 (June 28, 2005); 73 Fed. Reg. 7816 (Feb. 11, 2008); 76 Fed. Reg. 35,755 (June 20, 2011); *see also* 75 Fed. Reg. 29,489-90 (May 26, 2010) (overview of ESA listing of Oregon Coast coho salmon ESU).

41.    In 2008, NMFS finalized a special rule, pursuant to ESA section 4(d), that extends ESA section 9(a)(1)(B) to the Oregon Coast coho salmon ESU ("Special Rule").  *See* 50 C.F.R. § 223.203 (2017).  NMFS re-issued the Special Rule in 2011.  76 Fed. Reg. 35,755, 35,770 (June 20, 2011).

42.     The Special Rule identifies logging and road construction in the range of the Oregon Coast coho salmon ESU among the activities that are subject to the take prohibition.  50 C.F.R. § 223.203 (delineating activities exempt from the section 9 take prohibition).  In particular, "[a]ctivities that . . . could potentially 'harm' salmon"—like "logging" and "road construction in riparian areas" as well as areas that are "susceptible to mass wasting and surface erosion," and the "removal of large woody debris and 'sinker logs' or riparian shade canopy"— will "result[ ] in a violation of the section 9 take and other prohibitions."  73 Fed. Reg. 7816, 7830 (Feb. 11, 2008).  Consequently, persons engaging in these activities must obtain an Incidental Take Permit from NMFS pursuant to ESA section 10(a)(1)(B) or cease the activities; otherwise they risk exposure to enforcement by NMFS and/or parties of the prohibition on "take" in ESA section 9—such as the Plaintiffs in this action, who invoke the ESA's citizen-suit provision.  16 U.S.C. § 1540(g)(1)(A).

III.     THE TILLAMOOK AND CLATSOP STATE FORESTS

        A.     Tillamook State Forest

43.     The 364,000-acre Tillamook State Forest, the largest state forest in Oregon, consists primarily of second-growth, 40- to 60-year-old Douglas fir, with a 35- to 55-year-old conifer and hardwood understory and hardwood-dominated riparian areas along perennial streams.  These forestlands burned in a series of fires from 1933 to 1951, collectively known as the "Tillamook Burn."

44.     After the Tillamook Burn, private owners of forestlands logged millions of board feet from the burned forests, but then defaulted on their taxes and abandoned the logged areas. The lands reverted to several counties, which deeded the lands to the State of Oregon beginning in 1940.

14

45.    ODF undertook a massive reforestation and rehabilitation effort in the Tillamook Burn area from 1948 to 1973, when the Tillamook State Forest was established.

46.    Seven rivers flow through the Tillamook State Forest to the Pacific Ocean.  They are (1) the Wilson, Trask, Miami, and Kilchis rivers, which flow into Tillamook Bay; (2) the Nehalem River, which flows into the Pacific Ocean; and (3) the Nestucca and Little Nestucca rivers, which flow into Nestucca Bay.  NMFS has designated portions of these watersheds as critical habitat for the Oregon Coast coho salmon ESU due to the presence of spawning and rearing habitat and conservation value.  *See* 50 C.F.R. § 226.212(s); 73 Fed. Reg. at 7838-39.

47.    ODF's Tillamook and Forest Grove districts develop implementation and annual operations plans and offer timber sales that include clear-cutting and road construction on the Tillamook State Forest.

B.    Clatsop State Forest

48.    Established in 1937, the 136,000-acre Clatsop State Forest is the second-largest Oregon state forest.  The Clatsop State Forest does not include lands in the areas of the Tillamook Burn, but does, like the Tillamook State Forest, primarily consist of lands that were came under State ownership after private landowners logged but neglected to pay taxes on them.

49.    Due to extensive logging, most of the Clatsop State Forest consists of second-growth Douglas fir stands that are 30 to 70 years old.

50.    The Nehalem River, North Fork Nehalem River, Necanicum River, and portions of their tributaries flow through the Clatsop State Forest and are designated as critical habitat for the Oregon Coast coho salmon ESU.  *See* 50 C.F.R. § 226.212(s).

51.    ODF's Astoria District develops implementation and annual operations plans and offers timber sales that include clear-cutting and road construction on the Clatsop State Forest.

ODF's Forest Grove and Tillamook districts also manage small areas of the Clatsop State Forest, for which they also develop implementation and annual operations plans, and plan and sell timber and road construction projects.

III.    LOGGING AND ROAD CONSTRUCTION IN THE OREGON COAST RANGE HAVE CONTRIBUTED TO THE DECLINE OF OREGON COAST COHO SALMON.

52.    NMFS listed the Oregon Coast ESU due to declining abundance from the loss of freshwater habitat, the consequence of (among other human activities) logging—in particular, clear-cutting trees on steep, unstable slopes and along debris flow paths—and road construction associated with log-hauling in the Oregon Coast range.  *See*, *e.g*., 73 Fed. Reg. at 7821.  Soil erosion and stream sedimentation from logging, road construction, and repeated log-hauling with heavy logging trucks "seriously degrade[ ]" pools and side channels where coho spawn and spend their first phases of life.  60 Fed. Reg. 38,011, 38,024 (July 25, 1995); *see also* 62 Fed. Reg. 24,588, 24,592-93 (May 6, 1997) (logging removes natural vegetation; destroys riparian areas; reduces large woody debris; and triggers soil disturbance, mass wasting events, surface erosion, and sedimentation).

53.    NMFS was particularly concerned about ODF-authorized clearing of trees along streams and other riparian areas with no or ineffective riparian "buffers."  Logging in the Oregon Coast range also reduces and eliminates the input of "large woody debris" to streams.  When not logged, trees in riparian areas fall directly into streams, and trees growing on steep, erosion-prone slopes fall and are delivered to streams by debris flows.  Such large woody debris creates the complex stream structure—the pools, refuges, and side channels—that is crucial to coho survival.  Logging effectively eliminates or reduces such "large woody debris," thereby eliminating and reducing the pools and other refuges that are essential for juvenile coho salmon to survive and grow into smolts.  62 Fed. Reg. at 24,592-93.

54.    For many years before and after NMFS listed the Oregon Coast coho salmon ESU as a threatened species in 1998, the State of Oregon developed conservation plans and promised stronger protections, hoping to avert listing under the ESA.  Yet NMFS determined that the State's plans and rule changes were too inadequate to conserve coho salmon.  *See*, *e.g*., NMFS, FINAL ESA RECOVERY PLAN FOR OREGON COAST COHO SALMON S-6, 3-23 – 3-24 (2016), http://www.westcoast.fisheries.noaa.gov/publications/recovery_planning/salmon_steelhead/domains/oregon_coast/final_oc_coho_recovery_plan.pdf [hereinafter "Recovery Plan"]; 73 Fed. Reg. at 7821.

55.    Since 1998, NMFS has urged parties who engage in activities that cause incidental take of coho salmon to prepare HCPs and obtain ITPs pursuant to ESA section 10(a)(2)(A).  *See*, *e.g.*, 69 Fed. Reg. 33,102, 33,169, 33,154 (June 14, 2004).  The State of Washington did so for its forestry program in 2006.  *See* WASHINGTON STATE DEPARTMENT OF NATURAL RESOURCES, FOREST PRACTICES HABITAT CONSERVATION PLAN (2006), https://www.dnr.wa.gov/programs-and-services/forest-practices/forest-practices-habitat-conservation-plan#HCP Sections.

56.    NMFS has emphasized that an HCP and ITP for Oregon coast state forestlands was "particularly important since about 65 percent of the habitat in the range of the Oregon coast ESU is in non-Federal ownership."  63 Fed. Reg. 42,587, 42,590 (Aug. 10, 1998).

57.    When NMFS first proposed to list the Oregon Coast coho ESU as threatened in 1995, NMFS and ODF were developing a Habitat Conservation Plan that, if finalized and approved by NMFS, could have allowed ODF to obtain an ITP for the incidental take of ESA-listed species, including Oregon Coast coho salmon, from ODF-authorized logging.  *See* 62 Fed.

Reg. at 24,602; 63 Fed. Reg. at 42,590.  This was known as the "Western Oregon State Forests

Habitat Conservation Plan."  62 Fed. Reg. at 24,602.

58. ODF produced a draft of this HCP in November 1997 ("1997 Draft HCP").

59. NMFS detailed many substantive concerns with the 1997 Draft HCP and

questioned that it would adequately protect coho from logging and roads, especially from

reduced stream shade and recruitment of large woody debris, slope instability, and sedimentation

of coho-bearing streams.  ODF's refusal to address these concerns has stymied the development,

completion, and implementation of a final HCP to this day.

60. ODF abandoned the HCP development process.

61. In 2010, ODF adopted a new "Forest Management Plan" for ODF-authorized

logging activities in western Oregon. ODF, NORTHWEST OREGON STATE FORESTS MANAGEMENT

PLAN REVISED PLAN (2010),

https://www.oregon.gov/ODF/Documents/AboutODF/2010FMPNorthwestOregon.pdf

[hereinafter "2010 FMP"].

62. The 2010 FMP contains minimal protections for coho salmon that do not prevent

take.  In the 2010 FMP, ODF acknowledged that the routine authorization of clear-cutting and

short logging rotations reduces snags and prevents large woody debris from entering streams that

are essential coho breeding and rearing habitat.  ODF has admitted that under the 2010 FMP, the

forest conditions necessary to conserve coho salmon will not be achieved soon, and even under

the best-case scenario, may not be achievable for decades.  *See*, *e.g.*, OREGON DEPARTMENT OF

FORESTRY, FOREST GROVE DISTRICT 2018 ANNUAL OPERATIONS PLAN  31, 32 (2017),

https://www.oregon.gov/ODF/Documents/AboutODF/Forest%20Grove%20District%202018%2

0Annual%20Operations%20Plan.pdf (discussing the need "to restore the ecological processes

and functions that create and maintain self-sustaining habitats over the long term" "as resources allow").

63.     In December 2016, NMFS finalized a Recovery Plan for the Oregon Coast coho salmon ESU pursuant to section 4 of the ESA.  *See* 16 U.S.C. § 1533(f).  In the plan, NMFS points to "threats that reduce the quantity and quality of coho salmon rearing habitat"—including from sedimentation and the reduction of large woody debris—as factors that are "degrad[ing]" and "deteriorating" freshwater habitats and impeding recovery of the Oregon Coast ESU. Recovery Plan S-5, S-6.  NMFS found that existing regulatory mechanisms have not sustained the species long-term, *id*. at S-6, and that the "quality . . . and quantity of freshwater habitats leaves the [threatened] ESU at risk of becoming an endangered species."  *Id*. at S-7.

64.     In the Recovery Plan, NMFS reiterated that ODF should submit a final "Forestry Habitat Conservation plan to protect and restore Oregon Coast coho salmon habitat."  *Id*. at 6-57.

IV.    OREGON'S REGULATORY AND STATUTORY SCHEME FOR AUTHORIZING LOGGING AND ROAD BUILDING AND MAINTENANCE OPERATIONS ON THE TILLAMOOK AND CLATSOP STATE FORESTS.

65.     Logging on state forestlands in Oregon is regulated under the Oregon Forest Practices Act ("OFPA"), its implementing regulations, and forest management and other plans. ORS 527.610-527.785.  In addition, ODF, the State Forester, and the district foresters develop management plans with standards and guidelines to govern, and vest discretion in, the State Forester and district foresters' activities on the Tillamook and Clatsop state forests.

A.     The Oregon Forest Practices Act

66.     Enacted by the Oregon legislature in 1971, among other things OFPA defines terms and sets standards for commercial logging of Oregon's forestlands, including State-owned forestlands.  The law shares responsibility for managing the State's forestlands between ODF,

19

the State Forester, and the Oregon State Board of Forestry ("Board"), a board of seven

individuals who are appointed by the Governor and confirmed by the state Senate.

67.    The Board has promulgated implementing regulations for OFPA. These

regulations specify procedures and standards for authorization of logging and road construction

and maintenance regarding erosion, runoff, water quality, stream channels, and riparian areas.

These rules, known as the Oregon "Forest Practice Regulations" ("FPRs"), are found at OAR

629-001-0000 to 629-680-0430.

68.    Management of state forestlands is regulated under OAR 629-035. Management

of the Tillamook and Clatsop state forests is further regulated pursuant to standards and

guidelines that are set forth in forest management, implementation, and annual operations plans.

B.    The Forest Practice Regulations

69.    The State Forester and district foresters (collectively "the Foresters") manage

state forestlands pursuant to the FPRs found at OAR 629-035-0000-0500.

70.    The FPRs are administered primarily by and at the discretion of the State Forester

or his deputies, assistants, employees, or agents.

71.    These FPRs direct the Foresters to "actively manage" state forestlands and make

available a "sustainable and predictable production of forest products" to realize the lands'

"greatest permanent value." *See generally* OAR 629-035-0020; *id.* 629-035-0020(2)).

72.    In pursuit of the "greatest permanent value" on state forestlands, state and district

foresters emphasize timber production over protection of once-abundant coho salmon and other

native wildlife. For example, the FPRs require the State Forester to authorize logging on "any

Silviculturally Capable lands" unless prohibited by "a legal or contractual obligation" or unless

he determines that another use will be "more consistent" with GPV. *See* OAR 629-035-

20

0050(3)(A).  In addition, the FPRs allow the State Forester to authorize timber sales, including

clear-cutting, as well as road construction, on "erosion-prone" slopes.  OAR 629-630-0150(1)-

(3); 629-623-0400; 629-623-0800; 629-625-0100.

73.    The FPRs do not set additional standards to protect coho salmon and their

freshwater habitats from sedimentation caused by landslides.  OAR 629-623-0700.  Protections

are triggered only when "[h]igh landslide areas are a risk to public safety."  OAR 629-623-

0300(7); 629-623-0400(1) ("Operators shall not remove trees from high landslide hazard

locations with substantial downslope public safety risk unless a geotechnical report demonstrates

to the State Forester that any landslides that might occur will not be directly related to forest

practices because of very deep soil or other site-specific conditions.").

74.    The FPRs allow road construction and reconstruction on "very steep slopes,"

OAR 629-623-0050(2), high landslide hazard locations, OAR 629-625-0100(3), and/or "where

there is an apparent risk of road-generating materials entering waters of the state . . . ."  OAR

629-625-0100(2)(a).

75.    The FPRs permit logging activities without any effort by operators to leave large

woody debris in fish-bearing streams to improve stream complexity for coho salmon.  *See* OAR

629-640-0110 (acknowledging that many fish-bearing streams "currently need improvement"

because "they lack adequate amounts of large woody debris in channels, or they lack other

important habitat elements").

C.    Forest Management Planning

76.    The OFPA and FPRs are implemented on state forestlands through a series of

plans developed by ODF.

77.     First, the State Forester provides a "general management framework" through a "Forest Management Plan" ("FMP") to govern forestry and other activities within a specific region of forestland.  OAR 629-035-0030(1).  FMPs are approved and adopted by the Board as administrative rules, OAR 629-035-0105(1)(a).

78.     Management activities within each ODF district—including timber sales and road construction and maintenance—are developed in "implementation and operations plans."  *Id*.  An "Implementation Plan" ("IP") is developed at the discretion of the State Forester and relevant District Forester.  *Id*.  In an IP, which are issued for each ODF District every 10 years, a District Forester plans individual timber sales and specifies the logging methods for each sale—most often, clear-cutting—along with road construction and improvements.

79.     The district foresters plan, describe, and select specific timber sales for auction in "Annual Operations Plans" ("AOP").

80.     Since 2014, under this management scheme the Foresters have authorized logging on more than 37,000 acres of the Tillamook and Clatsop State Forests—including the clear-cutting of 25,000 acres and partial cutting of 12,000 acres—through at least 186 timber sales, ranging from 100 to 1,000 acres across numerous watersheds.  Many of these timber sales are on erosion-prone and/or "high landslide hazard locations" ("HLHL") that are located above and/or adjacent to coho-bearing streams.  These sales are listed in Table 1 at the end and incorporated by reference into this complaint.

81.     Since 1997, NMFS has maintained that Oregon's statutory and regulatory regime fails to avoid take and inadequately manages logging and road construction on "sensitive, unstable slopes" that are subject to mass-wasting landslides, and to "address [the] cumulative effects" of logging.  62 Fed. Reg. at 24,596.

V.    DEFENDANTS' LOGGING AND ROAD-CONSTRUCTION AND OTHER
PRACTICES TAKE COHO SALMON IN THE TILLAMOOK AND CLATSOP
STATE FORESTS AND DO NOT AVOID OR MINIMIZE SUCH ADVERSE
EFFECTS.

82.    Much of the Tillamook and Clatsop state forests are characterized by steep,

incised mountain slopes with an increased risk of landslides when clear-cut or dissected by

roads.  Forty-three percent of the Tillamook District has slopes at over 60 percent steepness and

at high risk for landslides.  Another 39 percent of slopes in the Tillamook District have a

steepness of between 30 and 60 percent.  This is the greatest concentration of steep slopes in

Oregon's northern Coast Range under any land ownership.

83.    About 30 percent of the Astoria District has slopes that are more than 30 percent

steep.

84.    Defendants' management of the Tillamook and Clatsop state forests prioritizes

production of timber revenue for counties over protection of habitat for coho salmon and other

native wildlife.  Extensive clear-cutting on these forests' steep, erosion-prone slopes has

increased the number and frequency of landslides.  Logging has also reduced the quantity and

size of large woody debris delivered to streams.  These impacts have led to increases in fine

sediment in coho-bearing streams and reduced stream complexity, creating a legacy of negative

impacts to coho habitat and coho.

85.    ODF's historical emphasis on timber production has also resulted in an extensive

network of roads to service logging operations and the hauling of logs from the Tillamook and

Clatsop state forests, with nearly 2,500 miles of forest roads by 2001 and even more today.  2010

FMP 2-58.

A.    The 2001 Forest Management Plan

86.    ODF first issued the FMP in 2001.  ODF, NORTHWEST OREGON STATE FORESTS
MANAGEMENT PLAN (2001) [hereinafter "2001 FMP"].

87.    The 2001 FMP aimed for a "mosaic" of forestlands, with 40 to 60 percent of the
forests consisting of "layered," "old forest structure" and with 40 to 60 percent consisting of
younger stands primarily created by clear-cutting.

88.    The 2001 FMP established restrictions in "riparian management areas" by
limiting logging within "stream bank" (stream to 25 feet), "inner" (25 to 100 feet), and "outer"
(100 to 170 feet) zones.  The degree to which logging is limited in these zones varies according
to the size of the stream and whether it has fish with the least amount of restriction on headwater
reaches. These widths are about half of the buffer widths that are required on federal public
lands, where for many streams logging is completely prohibited in buffers at least equal to two
tree heights, or roughly 300 feet.

89.    The buffers set in the 2001 FMP for Oregon state forestlands did not apply to
most small, non-fish-bearing streams that help keep coho-bearing streams cool, with limited
sediment inputs, and which provide a source of large woody debris that is critical to coho habitat.

90.    ODF applied many of the standards set in the 2001 FMP to the draft HCP that
ODF had begun to develop to address the ongoing take of coho salmon.  However, NMFS
advised ODF that these standards are inadequate to protect coho, and therefore, that NMFS
would not approve them as part of an ITP/HCP.

91.    In 2003, ODF amended the FMP with additional measures to conserve coho
habitat—*e.g.*, adopting a "Salmon Anchor Habitats" ("SAH") strategy to respond to NMFS's
concerns about unregulated take of coho salmon.  Under the SAH strategy, ODF designated 17

small watersheds to serve as the "core of salmon recovery" on the state forests. In those watersheds, ODF increased protections for riparian buffers and restricted the percentage of SAH watersheds that could be clear-cut within any 10-year period. As of 2009, 38 percent of the Tillamook District, 29 percent of the Forest Grove District and 22 percent of the Astoria District consisted of SAHs.

92.     However, the SAH strategy failed to satisfy NMFS's concerns, with the expert federal biological agency concluding that the state FMPs would not "provide . . . habitat that is capable of supporting [Oregon Coast coho salmon] populations that are viable during both good and poor marine conditions." 75 Fed. Reg. 29,489, 29,500 (May 26, 2010).

93.     During the implementation of the 2001 FMP through 2010, Defendants did not complete a final HCP or obtain an ITP from NMFS.

B.     The 2010 Forest Management Plan

94.     In 2010, the Board and ODF revised the FMP to accelerate and increase timber production from the Tillamook and Clatsop state forests. *See* 2010 FMP.

95.     To meet these new logging targets, ODF reduced its targets for layered, complex forests. Under the 2001 FMP, at least 40 percent of the covered forests were to consist of layered, old-forests. The 2010 FMP reduced that low-end target to 30 percent.

96.     In the 2010 FMP, the State Forester and ODF also reduced or eliminated protections for Oregon Coast coho salmon and their stream habitats. For example, they replaced the SAH strategy, which NMFS had deemed inadequate, with an even weaker strategy called Aquatic Anchors." The Aquatic Anchors strategy covers the same 17 small watersheds as the SAH Strategy, but removes the cap on clear-cutting that provided the only substantive protections to these watersheds under the SAH strategy.

97.     For areas outside of the Aquatic Anchors, the 2010 FMP established restrictions in "riparian management areas" by limiting logging within "inner" (25 to 100 feet) and "outer" (100 to 170 feet) riparian zones, depending on the size of streams and whether they support fish. These widths are about half of the buffer widths that are required on federal public lands, where for most streams, operators must retain buffers that are at least equal to two tree heights, or roughly 300 feet.

98.     The buffers set in the 2010 FMP for Oregon state forestlands did not apply to most small, non-fish-bearing streams that help to keep coho-bearing streams cool and which tend to occur on steep, landslide-prone slopes.  This has triggered delivery of large inputs of fine sediments to streams which would have provided shade and a source of large woody debris that is critical to coho habitat.

99.     These changes have allowed for an increase in clear-cutting and consequent road-building and log-hauling in watersheds where coho salmon live, including in Aquatic Anchors that were supposed to serve as core areas for coho salmon recovery.

100.     With the adoption of the 2010 FMP, the State Forester and ODF did not resolve NMFS's concerns about increased delivery of fine sediment to coho-bearing streams from logging and roads, or the lack of stream shade and large woody debris from inadequate and nonexistent riparian buffers.  Instead, pointing to its Species of Concern policy, Aquatic Anchor Strategy, and a "take-avoidance policy," in 2010 ODF simply declared that it would avoid all take of coho salmon.  On that basis, Defendants abandoned the HCP altogether.

101.     To date, the State Forester has not submitted a final, valid HCP to NMFS or obtained an ITP pursuant to sections 10(a)(1)(B) and 10(a)(2) of the ESA.  *See* 16 U.S.C. § 1539(a)(1)(B), (a)(2).

102.    Upon information and belief, the State Forester and district foresters have no firm plan to submit an HCP to be approved by NMFS or to obtain an ITP to cover the activities that they continue to plan and authorize on the Tillamook and Clatsop state forests.

VI.    INCREASED LANDSLIDES, SEDIMENTATION, AND REDUCED LARGE WOODY DEBRIS FROM LOGGING AND ROADS AUTHORIZED BY DEFENDANTS IN THE TILLAMOOK AND CLATSOP STATE FORESTS CAUSE DEATH, INJURY, AND HARASSMENT TO COHO AND SIGNIFICANTLY DEGRADE COHO HABITAT.

103.    ODF, the State Forester, and the district foresters plan and sell multiple timber sales on the Tillamook and Clatsop state forests every year under the 2010 FMP, Implementation Plans, and Annual Operations Plans for the Tillamook, Forest Grove, and Astoria districts. These sales frequently involve clear-cutting on erosion- or landscape-prone slopes in proximity to coho-bearing streams, and/or construction and hauling of logs on roads that are, in many areas, "hydrologically connected" ("HCR") to coho-bearing streams, meaning that when it rains, surface water flows directly from the roads to streams. *See* Table 1.

104.    For instance, the Tillamook, Forest Grove, and Astoria AOPs for the five-year period between 2014 and 2018 included more than 186 timber sales involving more than 25,000 acres of clear-cutting and nearly 12,000 acres of partial cutting, with many of these sales adjacent to or immediately upstream of coho-bearing streams.

105.    Since 2014, Defendants have planned and sold 42 timber sales in areas with the steep slopes that are at a high risk of landslides in the Tillamook and Clatsop state forests. *See* Table 1. These timber sales are adjacent to or upstream of coho-bearing streams—*i.e.*, landslides associated with these timber sales are reasonably certain to deliver harmful sediments to, or otherwise impair, coho-bearing streams.

106.    The State Forester and district foresters maintain an extensive network of roads throughout the Tillamook and Clatsop state forests for the purposes of logging and hauling felled trees.  When Defendants adopted the implementation plans for the Tillamook, Forest Grove, and Astoria districts in 2009 and 2011, there were about 2,658 miles of active roads on the Tillamook and Clatsop State Forests, enough to stretch from Portland to Columbus, Ohio.

107.    Through their planning and authorization of timber sales since 2010, the Foresters have authorized the addition of dozens of miles of new road construction every year.  For instance, the Tillamook, Forest Grove, and Astoria AOPs for the five-year period between 2014 and 2018 call for a total of 190 miles of new roads, or an average of 38 miles per year, as well as for the gravel resurfacing of up to 654 miles of existing roads, or about 131 miles per year. Many miles of these roads are adjacent to or upstream from coho-bearing streams.

108.    Logging roads that the Foresters plan and authorize increase sediment to coho streams by triggering landslides and direct discharge.

109.    Many studies conducted during the last fifty years in the Oregon Coast Range and elsewhere have shown that clear-cutting and roads used for hauling logs dramatically increase the frequency and severity of landslides.  Following logging, the frequency of landslides is up to 10 times the background rate, and logging roads increase the landslide risk by a factor of several hundred as compared to forested slopes.  Studies also show that landslides that are triggered by clear-cutting are substantially more certain to reach the streams and deliver fine sediments that are harmful to coho salmon and their habitat.

110.    Substantial portions of the Tillamook and Clatsop state forests are characterized by steep slopes that are at significant risk of landslides when clear-cut or dissected by roads.  For

example, more than 43 percent of the Tillamook District has slopes greater than 60 percent that are at high risk for landslides.

111.    Past logging and road construction on the Tillamook and Clatsop State Forests have triggered landslides, in many cases above coho-bearing streams.  Although ODF does not monitor whether logging or roads are causing landslides on the state forests, the Oregon Department of Geology and Mineral Industries maintains a database known as the "Statewide Landslide Information Database for Oregon, or "SLIDO," which includes locations and descriptions of landslides across the state and "contributing factors" to the slides.

112.    According to SLIDO, there were at least 76 landslides on the Tillamook and Clatsop state forests between 2005 and 2009, with roads or clear-cuts as contributing factors to the slides.

113.    Below are two true and correct photographic representations of landslides triggered by clear-cut logging and/or the placement/improvement of roads authorized by the Foresters on high-risk or erosion-prone areas, within a salmon anchor habitat for Oregon Coast coho salmon, on the Tillamook State Forest:



Landslide into Kinney Creek, South Fork Salmonberry Salmon Anchor Habitat.



Road-related landslide in the Salmonberry Watershed.

114.    The vast network of roads Defendants maintain on the Tillamook and Clatsop state forests chronically bleed sediments into coho streams.  Substantial stretches of this roads network are "hydrologically connected."  This means that when it rains, surface water flows directly from these roads to streams.  Studies show that construction, maintenance, and use of roads for hauling timber dramatically increases sediment mobilization and runoff of sediment into streams.

115.    Since 2014, Defendants have planned and sold at least 61 timber sales on the Tillamook and Clatsop state forests that use haul routes on hydrologically connected roads (Table 1).  This has lead to increased delivery of harmful fine sediments to coho-bearing streams.

116.    Whether through landslides, debris flows, and/or chronic inputs from roads and other erosion-prone areas, increased sedimentation of coho-bearing streams has severe, deleterious effects on coho salmon and their habitat.  Fine sediments infiltrate and bury the clean, well-oxygenated gravel beds that coho require for spawning, suffocating or entombing eggs or young salmon (alevins) and thereby resulting in take of coho salmon.

117.    Sediment deposition caused by landslides and runoff from logging and roads on the Tillamook and Clatsop state forests fills and destroys pools required by young coho salmon for foraging and to provide refuge from predators.  Sediment deposition in coho-bearing streams also limits the growth and abundance of the invertebrates that are the primary food source for young salmon.  Sediments become suspended in the water column, inhibiting feeding and, if severe enough, causing direct physiological stress for salmon.

118.    Particularly in small, headwater reaches, landslides or debris flows overwhelm the capacity of streams to transport sediments downstream, leading to wide, flat, meandering

channels that lack the habitat features needed for successful breeding, feeding, and sheltering, including spawning gravels and pools.

119.    Pulses of sediment from hydrologically connected roads planned and authorized by Defendants on the Tillamook and Clatsop state forests negatively affect coho habitat for miles downstream, and the effects last for decades.

120.    Studies show that in most small streams like those used by young coho salmon on the Tillamook and Clatsop state forests, the retention of the possible large woody debris that would otherwise create complex spawning habitat is not required for all, except for the narrowest, riparian buffer standards under the 2010 FMP.

121.    ODF-authorized logging in the Tillamook and Clatsop state forests greatly reduces the amount of large woody debris, thereby further reducing or eliminating stream complexity that is critical for coho to rest, feed, and avoid predators, impacting the quantity and quality of coho stream habitat and resulting in take of coho.

122.    Riparian buffers established by the State Forester and ODF do not adequately protect coho habitat from these causes of take on the Tillamook and Clatsop state forests.  By eliminating logs along or above coho-bearing streams that would otherwise deliver woody debris, ODF is depriving coho of habitat, directly contributing to reduced fitness, survival, and reproduction of Oregon Coast coho salmon.

<u>CLAIM FOR RELIEF</u>

123.    Plaintiffs re-allege paragraphs 1 through 122 and incorporate them herein by reference.

124.    Defendants have approved and are continuing to approve timber sales and logging operations in landslide-prone areas on the Tillamook and Clatsop State Forests.

125.    Defendants' planning and selling of timber sales involve clear-cutting, road-building, and/or road maintenance activities on the State forestlands at issue in this case.

126.    Logging, especially clear-cutting, on high-risk landslide locations or erosion-prone slopes increases the occurrence of landslides that add sediment to coho-bearing streams on the Tillamook and Clatsop state forests.  Landslides significantly degrade aquatic habitat by burying gravel beds and pools and changing stream channel morphology.  Where these effects occur in or upstream from streams that are occupied or used by listed coho salmon, they significantly disrupt and impair essential coho behavioral patterns, including spawning, rearing, feeding, and sheltering.  Injuries to and mortalities of listed coho salmon result.

127.    Weak riparian buffers established by the Defendants eliminate logs along streams that would otherwise deliver woody debris, thereby reducing or eliminating complex streams and directly contributing to reduced fitness, survival, and reproduction of Oregon Coast coho salmon.

128.    By authorizing logging, log-hauling, road construction, and/or road improvements on locations or slopes that are prone to or high risk of landslides on the Tillamook and Clatsop state forests where the ensuing landslides reach coho salmon habitat, and/or on areas that are hydrologically connected to coho-bearing streams, Defendants regularly plan, approve, and sell timber sales that are reasonably certain to cause take by killing, injuring, harassing, or harming coho salmon.

129.    Defendants' authorization of clear-cutting, log-hauling, road construction, and/or road improvements on high-risk landslide locations or erosion-prone slopes where the effects of the ensuing landslides reach coho salmon habitat, and/or on areas that are hydrologically connected to coho-bearing streams or waterbodies, without any authority to engage in activities that cause incidental take of Oregon Coast coho salmon, violates the ESA's take prohibition in

Section 9, 16 U.S.C. § 1538(a)(1)(B), which is made applicable to Oregon Coast coho salmon in the salmon 4(d) rule. *See* 50 C.F.R. § 223.203(a) and 16 U.S.C. § 1538(a)(1)(G).

130.    Unless enjoined, Defendants will continue to authorize logging, log-hauling, road construction, and/or road improvements on high-risk and erosion-prone slopes or where the effects of the ensuing landslides reach coho salmon habitat, and/or on areas that are hydrologically connected to coho-bearing streams or waterbodies, which result in unauthorized take in violation of 16 U.S.C. §§ 1538(a)(1)(B) & (G), 1538(g); 50 C.F.R. § 223.203(a); 73 Fed. Reg. 7816 (Feb. 8, 2008).

<u>PRAYER FOR RELIEF</u>

1.    Declare that Defendants have violated the ESA, *see* 16 U.S.C. § 1538(a)(1)(B) (take prohibition); *id.* § 1538(a)(1)(G) (making it unlawful to violate a 4(d) regulation), and the salmon 4(d) rule, *see* 50 C.F.R. § 223.203(a) and 73 Fed. Reg. 7816 (Feb. 8, 2008) (applying the ESA's take prohibition to Oregon coast coho salmon in the 4(d) regulation), by authorizing logging, log-hauling, road construction, and/or road maintenance on high-risk and erosion-prone slopes where the effects of the ensuing landslides reach coho salmon habitat, and/or on areas that are hydrologically connected to coho-bearing streams or waterbodies;

2.    Enjoin Defendants from engaging in the activities that are violating the ESA's take prohibition until and unless Defendants obtain an HCP/ITP pursuant to an enforceable timeline;

3.    Award Plaintiffs their reasonable attorneys' fees and litigation costs in this action pursuant to the ESA, 16 U.S.C. § 1540(g)(4); and

4.    Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 13th day of June, 2018.

*/s/ Amy R. Atwood*
Amy R. Atwood (OSB #060407)
atwood@biologicaldiversity.org
Tel: (971) 717-6401
P.O. Box 11374
Portland, OR 97211
CENTER FOR BIOLOGICAL DIVERSITY

Christopher G. Winter (OSB# 984355)
chris@crag.org
Tel: (503) 525-2725
Oliver J. H. Stiefel (OSB# 135436)
oliver@crag.org
Tel: (503) 227-2212
917 SW Oak Street, Suite 417
Portland, OR 97205
CRAG LAW CENTER

*Attorneys for Plaintiffs*

Nicholas Cady (OSB #113463)
nick@cascwild.org
Tel: (541) 434-1463
P.O. Box 10455
Eugene, OR 97440
CASCADIA WILDLANDS

*Attorney for Plaintiff Cascadia Wildlands*

Table 1. Sixty-seven timber sales planned and sold on the Tillamook and Clatsop State Forest that occur in areas at high risk of landslide or use haul routes on hydrologically connected roads in proximity to coho bearing streams. "HLHL" denotes timber sales that occur in areas of high landslide risk and "HCR" denotes timber sales that utilize haul routes on hydrologically connected roads.

| Name | Concern | District | AOP Year | Acres Total | Acres Clearcut | Acres Partial Cut | New Road Miles | Improved Road Miles |
|------|---------|----------|----------|-------------|----------------|-------------------|----------------|---------------------|
| Bull Nose | HCR | Astoria | 2015 | 208 | 208 | | 0.6 | 7.4 |
| Packy | HCR | Astoria | 2015 | 213 | 213 | | 0.6 | 12.4 |
| Green Olive | HCR | Astoria | 2015 | 134 | 134 | | 0.2 | 10.4 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Homesteader | HCR | Astoria | 2015 | 437 | 203 | 234 | 1.1 | 7.9 |
| Wage Against the Machine | HCR | Astoria | 2015 | 206 | 206 | | 0.6 | 6 |
| Greasy Hawk | HCR | Astoria | 2015 | 152 | 152 | | 0.2 | 1.8 |
| Lost Pony | HLHL, HCR | Astoria | 2015 | 159 | 159 | | 0.2 | 5.3 |
| Nowhere Land | HCR | Astoria | 2015 | 137 | 137 | | 0.4 | 0.7 |
| Treasure Island | HLHL | Astoria | 2015 | 182 | 182 | | 1.3 | 2.9 |
| Moonlight Drive | HLHL | Astoria | 2015 | 93 | 93 | | 1.3 | 1.4 |
| Quarter Mile | HLHL | Astoria | 2015 | 68 | 68 | | 1.9 | 0.8 |
| Emerald Isle | HCR | Astoria | 2016 | 148 | 148 | | | |
| Greasy Hawk | HCR | Astoria | 2016 | 184 | 184 | | 0.9 | 1.8 |
| Green Olive | HCR | Astoria | 2016 | 137 | 137 | | 0.2 | 10.4 |
| Homesteader | HCR | Astoria | 2016 | 255 | 207 | 48 | 0.9 | 7.9 |
| Lost Pony | HLHL, HCR | Astoria | 2016 | 148 | 148 | | 0.2 | 5.3 |
| Meier Mainline Combo | HCR | Astoria | 2016 | 204 | 50 | 154 | 1.7 | 5.5 |
| Nowhere Land | HCR | Astoria | 2016 | 132 | 132 | | 0.4 | 1.2 |
| Packy | HCR | Astoria | 2016 | 219 | 219 | | 0.6 | 12.4 |
| Quarter Mile | HLHL | Astoria | 2016 | 192 | 192 | | 3.9 | 0.8 |
| Emerald Isle | HCR | Astoria | 2017 | 155 | 155 | | 1.4 | 2.8 |
| Crawfish Corner | HLHL | Astoria | 2017 | 152 | 33 | 152 | 0.6 | 4.1 |
| Mor Nor Wolf | HCR | Forest Grove | 2015 | 189 | 189 | | 1.42 | 4.93 |
| Cedar Flats | HCR | Forest Grove | 2015 | 97 | 97 | | 0.63 | 0 |
| Chicken of the Tree | HCR | Forest Grove | 2015 | 106 | 106 | | 0.44 | 1.6 |
| Motley Lou | HLHL | Forest Grove | 2015 | 276 | | 276 | 2.45 | 1.44 |
| Poley Anna | HCR | Forest Grove | 2015 | 216 | | 216 | 0.7 | 3.8 |
| Round House | HCR | Forest Grove | 2015 | 297 | 157 | 140 | 2.45 | 4.68 |
| Top Step | HCR | Forest Grove | 2015 | 91 | | 91 | 1.2 | 0.8 |
| Rusty Rope | HCR | Forest Grove | 2016 | 157 | 157 | | 0.98 | 11.7 |
| Shining C | HCR | Forest Grove | 2016 | 111 | 111 | | 0.81 | 0.45 |
| Catch and Release | HCR | Forest Grove | 2016 | 368 | | 368 | 0.42 | 0 |
| Nehalem Breaks | HCR | Forest | 2016 | 145 | 145 | | 1.04 | 2.71 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Grove | | | | | | |
| My Mulligan | HCR | Forest Grove | 2016 | 110 | 110 | | 0 | 0 |
| Moving Music | HCR | Forest Grove | 2017 | 119 | 119 | | 1.42 | 1 |
| Camp View | HCR | Forest Grove | 2017 | 151 | 151 | | 0.58 | 2.4 |
| Woods Way | HCR | Forest Grove | 2017 | 110 | 110 | | 0.87 | 2.3 |
| Salmonberry Bends | HCR | Forest Grove | 2017 | 116 | 116 | | 0 | 1.5 |
| Mega Lou Mania | HCR | Forest Grove | 2017 | 118 | 118 | | 1 | 0 |
| My Mulligan | HCR | Forest Grove | 2017 | 108 | 108 | | 0 | 0 |
| Old Norse | HCR | Forest Grove | 2017 | 116 | 116 | | 0 | 0 |
| Voltaires Flair | HCR | Forest Grove | 2017 | 363 | | 363 | 0 | 0.5 |
| Schetky Aneu | HLHL | Tillamook | 2015 | 109 | 109 | | 2.6 | 5.3 |
| Ax Ridge | HLHL | Tillamook | 2015 | 302 | 237 | 65 | 5.3 | 1.6 |
| Between Wolves | HLHL, HCR | Tillamook | 2015 | 200 | 200 | | 1.9 | 2.7 |
| Bling Ridge | HLHL, HCR | Tillamook | 2015 | 429 | 429 | | 1.6 | 6.4 |
| S' Moore | HLHL, HCR | Tillamook | 2015 | 259 | 203 | 56 | 3.5 | 0.9 |
| Feldshaw | HCR | Tillamook | 2015 | 120 | 120 | | 0.8 | 0 |
| The Gilmore | HLHL, HCR | Tillamook | 2015 | 699 | 89 | 610 | 3.1 | 0 |
| Old Bungee | HLHL, HCR | Tillamook | 2016 | 610 | 335 | 275 | 4 | 0 |
| Clay Pigeon | HLHL, HCR | Tillamook | 2016 | 205 | 205 | | 2 | 0 |
| Clear Silence | HLHL | Tillamook | 2016 | 426 | 261 | 165 | 1 | 3 |
| Fireworks | HLHL | Tillamook | 2016 | 330 | 330 | | 0 | 15 |
| King Kong | HLHL, HCR | Tillamook | 2016 | 476 | 476 | | 3 | 1 |
| The Simms | HLHL, HCR | Tillamook | 2016 | 949 | 949 | | 3.36 | 3.4 |
| Three Little Ridges | HCR | Tillamook | 2016 | 348 | 348 | | 3 | 8 |
| Tres Hembres | HLHL | Tillamook | 2016 | 346 | 346 | | 1 | 9 |
| Broken Arrow | HLHL, HCR | Tillamook | 2016 | 335 | 335 | | 2.19 | 2.6 |
| Lobo Canyon | HLHL, | Tillamook | 2016 | 194 | 194 | | 0.99 | 4.19 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | HCR | | | | | | | |
| Brimstone | HLHL | Tillamook | 2017 | 27 | 27 | | 0.98 | 3.16 |
| Doghouse | HLHL, HCR | Tillamook | 2017 | 375 | 375 | | 2.16 | 4.8 |
| Little Bumps | HLHL, HCR | Tillamook | 2017 | 73 | 73 | | 0.5 | 0 |
| Rocky Rd | HLHL, HCR | Tillamook | 2017 | 613 | 298 | 315 | 6.25 | 2.85 |
| Knot Berry | HLHL | Tillamook | 2017 | 193 | 193 | | 1.67 | 2.6 |
| Odin's Blade | HLHL, HCR | Tillamook | 2017 | 540 | 540 | | 0.64 | 10.55 |
| Red Buzzard | HLHL, HCR | Tillamook | 2017 | 203 | 203 | | 0.85 | 10.5 |
| High Standards | HLHL, HCR | Tillamook | 2017 | 110 | 110 | | 1.96 | 3.53 |
| Kilchis Saddle | HLHL, HCR | Tillamook | 2018 | 225 | 225 | | 1.57 | 13.2 |
| Clam Bake | HLHL | Tillamook | 2018 | 402 | 402 | | 2.22 | 18.1 |
| Lost HilHLHL | HLHL | Tillamook | 2018 | 236 | 236 | | 1.9 | 6.5 |
| Coast Bill | HLHL | Tillamook | 2018 | 222 | 222 | | 1.95 | 8.27 |
| Double Bypass | HLHL, HCR | Tillamook | 2018 | 77 | 77 | | | 9.1 |
| Hopscotch | HLHL | Tillamook | 2018 | 111 | 0 | | 0.9 | 6.1 |
| Thor's Summit | HLHL, HCR | Tillamook | 2018 | 107 | 107 | | 2.4 | 12 |
| Broken Arrow | HLHL, HCR | Tillamook | 2018 | 405 | 405 | | 2.11 | 7.4 |
| Franken Fir | HLHL, HCR | Tillamook | 2018 | 313 | 313 | | 1.54 | 7.1 |
| General Lee | HLHL, HCR | Tillamook | 2018 | 157 | 157 | | 0.94 | 10.9 |
| Southern Steamer | HLHL, HCR | Tillamook | 2018 | 209 | 209 | | 3.25 | 13.8 |